PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

```
FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 24 2000
THOMAS K. KAHN
CLERK
```

_____

No. 98-4109

_____

D. C. Docket No. 96-2457-CV-FAM

WILLIAM BISHOP,

Petitioner-Appellee,

versus

JANET RENO, U.S. ATTORNEY GENERAL,
DIRECTOR OF THE UNITED STATES BUREAU
OF PRISONS, U.S. Bureau of Prisons,
WARDEN, DADE COUNTY JAIL, Federal Detention
Center, Miami, U.S. PAROLE,

Respondents-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____
**(April 24, 2000)**

Before EDMONDSON and BIRCH, Circuit Judges, and OWENS*, Senior District
Judge.

_____
* Honorable Wilbur D. Owens, U.S. Senior District Judge for the Middle District of Georgia, sitting
by designation.

BIRCH, Circuit Judge:

This appeal requires us to determine whether a district court has subject matter jurisdiction to entertain habeas corpus relief for a foreign sentence of a United States citizen, who is serving the foreign sentence in the United States pursuant to treaty transfer. The district judge granted habeas relief and reduced the foreign sentence. We reverse and remand for dismissal.

## I. BACKGROUND

In July, 1995, petitioner-appellee and United States citizen, William Bishop, was convicted by a Bahamian court of conspiracy to possess with intent to supply 1,956 pounds of marijuana. He was sentenced to a five-year term of imprisonment and an $80,000 fine. If Bishop failed to pay the fine by the end of this five-year term of imprisonment, then the Bahamian court sentenced him to serve an additional five years in prison "bringing the to[t]al imprisonment to 10 years." R1-1-Exh. A-1.[1]

In a March 22, 1996, letter to the Attorney General of the Bahamas, the United States Department of Justice ("DOJ") requested that Bishop be transferred to the United States to serve the remainder of his sentence pursuant to the Council of Europe Convention on the Transfer of Sentenced Persons, Mar. 21, 1983, 35 U.S.T. 2867, T.I.A.S. No. 10824 (entered into force in the United States on July 1, 1985) ("Treaty"),

---

[1] The Bahamian prison authorities subsequently accorded Bishop a "[r]emission" of three years and four months that commuted his imprisonment term to six years and eight months, which made him "due for discharge on the 11th March, 2002. 11/3/2002." R1-1-Exh.1-2.

to which the United States and the Bahamas are signatories. The DOJ letter specifically states that "[t]he United States will apply the 'continued enforcement' provision of the [Treaty] to the United States nationals transferred from the Bahamas to serve their sentences in the United States." R1-11-Exh. D, Attachment C. In accordance with 18 U.S.C. § 4108, a United States magistrate judge conducted a hearing in the Bahamas that included Bishop and other similarly sentenced offenders to verify their consent to the transfer.

At this April 10, 1996, hearing, Bishop and the other convicted transferees were represented by an assistant federal public defender from the Southern District of New York. That counsel subsequently testified at an evidentiary hearing that he advised the transferees "that a sentence can only be modified or set aside by a proceeding brought in the Bahamas and not in the United States."[2] R2-9. During the hearing, the magistrate judge explained the consequences of the convicts' consent to transfer. He informed the sworn transferees collectively: "[Y]ou understand that your conviction or sentence can only be modified or set aside through appropriate proceedings brought by you, or on your behalf, in the Commonwealth of the Bahamas. " R1-11-Exh. E-13. Bishop raised his hand acknowledging his understanding. Pursuant to individual

---

[2] The assistant federal public defender testified that he informed Bishop that the worst case scenario was that he would serve ten years of imprisonment "[l]ess good time" earned in the Bahamas and in the United States. R2-14.

questioning as to understanding of the result of the transfer, Bishop stated that he understood the consequences. See id. at 18. In the presence of the magistrate judge, Bishop additionally signed a verified consent form, showing his agreement to being transferred to the United States to serve the remainder of his Bahamian sentence.[3]

Because Bishop did not pay his imposed fine, the Bureau of Prisons ("BOP") calculated his sentence to include the additional five-year incarceration ordered by the Bahamian court if the fine was not paid.[4] This five-year term subsequently was translated by the United States Parole Commission ("Parole Commission") into supervised release.[5] An assistant federal public defender in the Southern District of Florida wrote the BOP on Bishop's behalf that his imprisonment for his inability to pay his fine violated the United States Constitution under Tate v. Short, 401 U.S. 395, 91

---

[3] In relevant part, the verified consent states:

> My conviction or sentence can only be modified or set aside
> through appropriate proceedings brought by me or on my behalf in
> the Commonwealth of The Bahamas;
> . . . .
> I HEREBY CONSENT TO MY TRANSFER TO THE UNITED
> STATES OF AMERICA FOR EXECUTION OF THE PENAL
> SENTENCE IMPOSED ON ME BY A COURT OF THE
> COMMONWEALTH OF THE BAHAMAS

R1-11-Exh. F.

[4] Although his statutory release date was set as August 17, 2004, his projected satisfaction date with anticipated adjustments was July 26, 2003. See R1-1-Exh. C at 3.

[5] After an evidentiary hearing, the Parole Commission reduced Bishop's incarceration term from 120 months to 60 months to be followed by 60 months of supervised release.

S.Ct. 668 (1971). While the BOP acknowledged that a defendant's imprisonment because of his inability to pay a fine would be unconstitutional in the United States, it explained that "the sentence is enforceable in the United States as required by the treaty. The defendant was fully aware of, and accepted, the conditions under which the transfer was made." R1-1-Exh. D at 5 (BOP Bahamian Foreign Treaty Sentences memorandum). The BOP response further advised "that the defendant's method of relief should be taken up with the Bahamian courts or by way of a petition for a writ of habeas corpus with the federal court." Id. at 6.

The assistant federal public defender then filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 in federal court for the Southern District of Florida and asserted that a prison term imposed for indigence "may not be enforced and a federal court has authority to release an inmate from service of such an illegal sentence." R1-1-3. In a consolidated response for respondents Attorney General Janet Reno, the BOP Director, and the Federal Detention Center Warden, the government asserted that the district court was without jurisdiction under the Treaty to modify Bishop's Bahamian sentence. Because of his verified and documented consent to the conditions of his transfer to the United States to serve the remainder of his Bahamian sentence, the government alternatively argued that Bishop had waived his right to challenge his Bahamian sentence in a United States court.

5

Following two reports and recommendations by a magistrate judge that Bishop's habeas corpus petition be granted as well as an evidentiary hearing, the district judge conducted a status conference in Bishop's case and the other transferee cases presenting the same issue. With respect to Bishop, the following exchange occurred between the assistant federal public defender and the district judge:

> [COUNSEL]: When Mr. Bishop filed his initial petition, he had a ten year sentence. The Parole Commission has reduced that to five years, which was the imprisonment relief he sought by way of this petition, but they tacked on a five year period of supervised release to follow.
>    As to Mr. Bishop, our request is for the Court to strike the five year period of supervised release which would make his sentence longer in effect.
>
> THE COURT: What authority do I have to do that? I either vacate — you get the whole thing or nothing.
>    . . . .
> [COUNSEL]: You could. That is an alternative you have. You can either strike — you can vacate the treaty transfer determination of the Parole Commission completely. They can hold a new hearing or <u>you can just strike that portion of it which offends the constitution which at this point is the supervised release portion of five years.</u>

R3-4, 5 (emphasis added). The government maintained its position that the district judge was without jurisdiction to strike any part of Bishop's sentence based on his Bahamian sentence.

Thereafter, the district judge granted Bishop's habeas petition by striking the Bahamian five-year sentence for failure to pay his fine: "The terms of imprisonment that were imposed shall be ADAPTED, in accordance with the U.S. - Bahamas Treaty,

6

Art. 10 § 2, Art. 9 § 3, to include only that portion of the sentence which was actually imposed, and not the remaining portion which is optional upon the payment of a fine." R1-36-2. Although Bishop has completed the incarceration portion of his sentence, he remains on supervised release pending this appeal. On appeal from the grant of habeas relief to Bishop, the government pursues its argument that the district court lacked jurisdiction to reduce Bishop's Bahamian sentence.[6]

## II. DISCUSSION

Subject matter jurisdiction of the district court is a legal question that we review de novo. See Abebe-Jira v. Negewo, 72 F.3d 844, 846 (11th Cir. 1996). "Federal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377, 114 S.Ct. 1673, 1675 (1994); see Celotex Corp. v. Edwards, 514 U.S. 300, 307, 115 S.Ct. 1493, 1498 (1995) (stating that the jurisdiction of "federal courts . . . is grounded in, and limited by, statute"). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting

---

[6] The government also maintains on appeal its alternative argument that, even if the district court has jurisdiction to grant habeas relief on a foreign sentence being served in the United States, Bishop's sworn consent to transfer to the United States to serve the remainder of his sentence waived such a collateral challenge. Because we decide that a district court lacks jurisdiction to grant habeas relief for a foreign sentence being served in the United States pursuant to the Treaty, we need not address this alternative waiver argument.

jurisdiction." Kokkonen, 511 U.S. at 377, 114 S.Ct. at 1675 (citation omitted). "As courts of limited jurisdiction, the federal district courts possess no warrant to create jurisdictional law of their own." Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 711, 102 S.Ct. 2099, 2109 (1982).

Questions of statutory and treaty interpretation present legal questions that are subject to plenary review. See United States v. MacAllister, 160 F.3d 1304, 1306 (11th Cir. 1998) (per curiam), cert. denied, __ U.S. __, 120 S.Ct. 318 (1999); United States v. Puentes, 50 F.3d 1567, 1575 (11th Cir. 1995). "[I]t is a well established axiom of statutory interpretation that in construing a statute, courts must first look to the plain meaning of the statute itself." Solis-Ramirez v. United States Dep't of Justice, 758 F.2d 1426, 1430 (11th Cir. 1985) (per curiam). "When the text of the statute is clear, our interpretive inquiry ends." Fogerty v. Fantasy, Inc., 510 U.S. 517, 538, 114 S.Ct. 1023, 1035 (1994) (Thomas, J., concurring). "'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" Philbrook v. Glodgett, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898 (1975) (citation omitted). Penal laws are construed strictly because legislatures, not courts, define crimes and establish punishments. See Yates v. United States, 354 U.S. 298, 304, 77 S.Ct. 1064, 1069 (1957), overruled on other grounds, Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141 (1978). Therefore, "we

8

must adopt the plain meaning of a statute, however severe the consequences." Jay v. Boyd, 351 U.S. 345, 357, 76 S.Ct. 919, 927 (1956).

"When interpreting a treaty, we 'begin "with the text of the treaty and the context in which the written words are used."'" Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699, 108 S.Ct. 2104, 2108 (1988) (citations omitted). In construing treaties, "'"we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties."'" Id. at 700, 108 S.Ct. at 2108. Under the Supremacy Clause, "an Act of Congress, which must comply with the Constitution, is on a full parity with a treaty." [7] Reid v. Covert, 354 U.S. 1, 18, 77 S.Ct. 1222, 1231 (1957). While we construe treaties and statutes alike in determining meaning from the terms, see United States v. Alvarez-Machain, 504 U.S. 655, 663, 112 S.Ct. 2188, 2193 (1992), the "rule of equality" prohibits implementing statutory law that renders any treaty term nugatory, Asakura v. City of Seattle, 265 U.S. 332, 341, 44 S.Ct. 515, 516, amended on other grounds, 44 S.Ct. 634 (1924).

---

[7] The Supremacy Clause provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. We note that this case does not involve a statute that is subsequent to and inconsistent with a treaty, which would render the treaty void to the extent of the conflict. See Reid, 354 U.S. at 18, 77 S.Ct. at 1231; see also Herrmann v. Meese, 849 F.2d 101, 103 (3d Cir. 1988) (concluding that the preceding statutes that implement this Treaty were intended to apply to future treaties).

To decide if the district court had jurisdiction to grant collateral, habeas relief on a foreign sentence is to delineate the interaction between the Treaty and the implementing statutes, which determine the procedure in the United States for administering a foreign-imposed sentence to be completed here. See Cannon v. U.S. Dep't of Justice, 973 F.2d 1190, 1197 (5th Cir. 1992) ("Procedural legislation which makes operation of a Treaty more convenient cannot amend or abrogate a self-executing Treaty."). The Treaty signatories recognized "that foreigners who are deprived of their liberty as a result of their commission of a criminal offense should be given the opportunity to serve their sentences within their own society" and "that this aim can be achieved by having them transferred to their own countries." [8] Treaty, 35 U.S.T. at 2870 (preamble)[9]; see Kanasola v. Civiletti, 630 F.2d 472, 474 (6th Cir.

---

[8] The Treaty defines "'sentence'" as "any punishment or measure involving deprivation of liberty ordered by a court for a limited or unlimited period of time on account of a criminal offence," and "'judgment' means a decision or order of a court imposing a sentence." Treaty, art. 1, §§ a, b, 35 U.S.T. at 2870. The terms "'sentencing State,'" meaning "the State in which the sentence was imposed on the person who may be, or has been, transferred," and "'administering State,'" meaning "the State to which the sentenced person may be, or has been, transferred in order to serve his sentence" because he is a citizen of that country, id. at art. 1, §§ c, d, also are referenced respectively in this opinion as "sentencing country" and "administering country." We additionally include the reasoning of other circuit courts that have addressed similar transfer treaties with analogous provisions.

[9] Explaining the general considerations behind the Convention on the Transfer of Sentenced Persons, the Council of Europe stated:

> In facilitating the transfer of foreign prisoners, the convention takes account of modern trends in crime and penal policy. . . . As penal policy has come to lay greater emphasis upon the social rehabilitation of offenders, it may be of paramount

10

1980) (per curiam) (acknowledging that our country enters into transfer treaties with foreign nations "to permit an American citizen convicted of a crime in a foreign country to serve his sentence in a prison at home where conditions are much better"). Nevertheless, "[a] sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." Wilson v. Girard, 354 U.S. 525, 529, 77 S.Ct. 1409, 1412 (1957). Furthermore, provisions of our Constitution, including the writ of habeas corpus, "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country"; an American citizen who commits a crime in a foreign country is subject to trial and punishment under the laws of that country. Neely v. Henkel, 180 U.S. 109, 122, 123, 21 S.Ct. 302, 307 (1901).

"A sovereign does not lose its power to keep a convict in custody by turning the convict over to another sovereign for service of a sentence. . . .'[T]he question of

---

importance that the sanction imposed on the offender is enforced in his home country rather than in the state where the offence was committed and the judgment rendered. This policy is also rooted in humanitarian considerations: difficulties in communication by reason of language barriers, alienation from local culture and customs, and the absence of contacts with relatives may have detrimental effects on the foreign prisoner. The repatriation of sentenced persons may therefore be in the best interests of the prisoners as well as of the governments concerned.

Council of Europe, Explanatory Report on the Convention on the Transfer of Sentenced Persons at 6-7, ¶ 9 (1983) (hereinafter "Explanatory Report").

11

jurisdiction and custody is one of comity between the two governments and not a personal right of the prisoner.'" Tavarez v. U.S. Attorney General, 668 F.2d 805, 809 (5th Cir. 1982) (citation omitted) (alteration in original). Because foreign governments likely would not consent to the transfer of United States citizens serving sentences in their countries for crimes committed while abroad if the United States were to disregard the convictions and sentences of transferees in this country, jurisdictional exclusivity is a reasonable treaty term. See Rosado v. Civiletti, 621 F.2d 1179, 1200 (2d Cir. 1980) ("In assessing the interacting interests of the United States and foreign nations, 'we must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'" (quoting Romero v. International Terminal Operating Co., 358 U.S. 354, 383, 79 S.Ct. 468, 486 (1959) (alteration in original)).

A "sentence" under the Treaty means imprisonment for a criminal conviction. See Treaty, art. 1, § a, 35 U.S.T. at 2870. The Treaty "applies only" to implementing this "deprivation of liberty . . . regardless of whether the person concerned is already serving his sentence or not." Explanatory Report at 8, ¶ 13. Upon agreement between the sentencing country and the administering country to a prisoner's transfer, see Treaty, art. 3, § 1, ¶ f, 35 U.S.T. at 2872, enforcement of the sentence is suspended in the sentencing country, see Treaty, art. 8, § 1, 35 U.S.T. at 2876, and the administering

country must either <u>continue</u> or <u>convert</u> the sentence of the sentencing country, <u>see</u> Treaty, art. 9, § 1, 35 U.S.T. at 2876.  <u>See also</u> <u>Asare v. United States Parole Comm'n</u>, 2 F.3d 540, 541 (4th Cir. 1993) (interpreting this Treaty).   The distinction between "continued enforcement" and "conversion of sentence" in the administering country is that the former "continues to enforce the sanction imposed in the sentencing state," although it may be adapted in accordance with the Treaty, while the latter converts the sentence "into a sanction of the administering state, with the result that the sentence enforced is no longer directly based on the sanction imposed in the sentencing state." Explanatory Report at 15, ¶ 46.

When the administering country elects continued enforcement, as in this case, the Treaty provides:

## Continued enforcement

1. In the case of continued enforcement, the administering State shall be bound by the legal nature and duration of the sentence as determined by the sentencing State.

2. If, however, this sentence is by its nature or duration incompatible with the law of the administering State, or its law so requires, that State may, by a court or administrative order, adapt the sanction to the punishment or measure prescribed by its own law for a similar offense. As to its nature, the punishment or measure shall, as far as possible, correspond with that imposed by the sentence to be enforced. It shall not aggravate, by its nature or duration, the sanction imposed in the sentencing State, nor exceed the maximum prescribed by the law of the administering State.

Treaty, art. 10, 35 U.S.T. at 2876. Consequently, the administering country "is bound by" two conditions of the sentence as imposed by the sentencing country: the legal nature and the duration of the sentence. Explanatory Report at 16, ¶ 49. "Legal nature" means "the kind of penalty imposed where the law of the sentencing state provides for a diversity of penalties involving deprivation of liberty, such as penal servitude, imprisonment or detention." Id. "Duration" is the term of the sentence to be served in the administering country, subject to that country's decision on conditional release or remission corresponding to the original sentence and "taking into account the time served and any remission earned in the sentencing state up to the date of transfer." Id.

When the sentencing country and the administering country "have different penal systems with regard to the division of penalties or the minimum and maximum

14

lengths of sentence," Explanatory Report at 16, ¶ 50, the Treaty permits the administering country to adapt the sentence in accordance with "the punishment or measure prescribed by its own law for a similar offence," Article 10, § 2 . This adaptation by the administering country, however, is restricted: the administering country may adapt the original sentence so long as it does not render a more severe detention in nature or duration than the sentence imposed by the sentencing state "and it must not exceed the maximum prescribed by the law of the administering state." Explanatory Report at 16, ¶ 50. Under the adaptation procedure of Article 10, § 2, the administering country <u>adapts</u> the original sentence "to an equivalent sanction prescribed by its own law in order to make the sentence enforceable" and "thus continues to enforce the sentence imposed in the sentencing state, but it does so in accordance with the requirements of its own penal system." <u>Id.</u>; <u>see</u> <u>Herrmann v. Meese</u>, 849 F.2d 101, 102-03 (3d Cir. 1988) (interpreting the same Treaty with the Explanatory Report, the Third Circuit determined that Article 10, § 2 is applicable only if the government chooses to adapt the foreign sentence). In contrast to the adaptation procedure of Article 10, § 2, the sentence conversion of Article 11 "<u>substitutes</u> a sanction for that imposed in the sentencing state." Explanatory Report at 16, ¶ 50.

Additionally, Article 13 provides that "[t]he sentencing State alone shall have the right to decide on any application for review of the judgment." Treaty, art. 13, 35

15

U.S.T. at 2878. The Treaty defines "judgment" as the sentencing order of the court in the sentencing country. See Treaty, art. 1, § b; Explanatory Report at 8, ¶ 14. While the convicted prisoner may challenge his sentence factually and legally, the exclusive jurisdiction of the sentencing country to review the sentence is justified because such "review proceedings are not part of enforcement" in the administering country. Explanatory Report at 18, ¶ 60. Under the plain meaning of its terms, "[t]he Treaty does not create new rights which enable a foreign convict to have a review of an otherwise final foreign judgment." Pfeifer v. United States Bureau of Prisons, 615 F.2d 873, 876 (9th Cir. 1980) (affirming denying habeas relief to United States citizen serving remainder of Mexican sentence in federal penitentiary).

Significantly, the DOJ's letter informed the Bahamian government that the United States would continue Bishop's Bahamian sentence. Under the Treaty, that election committed the United States to maintain the nature and duration of Bishop's Bahamian sentence, although adaptation in accordance with our penal law was permissible. See Treaty, art. 10, 35 U.S.T. at 2876; Herrmann, 849 F.2d at 102-03. The Treaty terms, therefore, required the United States to retain Bishop's Bahamian sentence of five years of imprisonment for his drug crime, with an additional five years

of imprisonment for his failure to pay his $80,000 fine as imposed by the Bahamian court.[10]

Our implementing legislation governing treaty transferees who are completing their foreign sentences in the United States, 18 U.S.C. §§ 3244 and 4100 et seq.,[11] is

---

[10] Because this appeal relates only to Bishop's original Bahamian sentence, we do not address specifically any credits or adjustments applied to that sentence either in the Bahamas or in the United States.

[11] The Transfer of Offenders To and From Foreign Countries Act, 18 U.S.C. § 4100 et seq. (1977), authorizes the Attorney General "to make regulations for the proper implementation of such treaties in accordance with this chapter and to make regulations to implement this chapter." 18 U.S.C. § 4102(4). Thus, the various provisions establish the procedure by which the foreign sentence of a Treaty transferee is translated into a United States sentence appropriate for domestic penal enforcement. "Upon the receipt of an offender who is on parole from the authorities of a foreign country, the Attorney General shall assign the offender to the Parole Commission for supervision." 18 U.S.C. § 4106A(a). The Sentencing Guidelines apply to the sentences of transferees whose convictions occurred after November 1, 1987, as in this case. See 18 U.S.C. § 4106A(c); Cannon, 973 F.2d at 1196 & n.36.
    The Parole Commission is designated to adapt the foreign sentence so that it can be administered under the laws of the United States and to determine a "release date" from incarceration together with the period and conditions of supervised release "as though the offender were convicted in a United States district court of a similar offense." See 18 U.S.C. § 4106A(b)(1)(A); see Tramel v. United States Parole Comm'n, 100 F.3d 129, 130 (11th Cir. 1996) (per curiam) (stating that the Parole Commission "ha[s] jurisdiction to determine a release date and a period of supervised release for each [transferred] prisoner"). "The combined periods of imprisonment and supervised release" determined by the Parole Commission "shall not exceed the term of imprisonment imposed by the foreign court" on the transferee. 18 U.S.C. § 4106A(b)(1)(C); see Cannon, 973 F.2d at 1197 & n.42 (recognizing that "the [Parole] Commission is not free to vary the total sentence of a Treaty prisoner," consisting of incarceration plus supervised release); see also Tramel, 100 F.3d at 131 ("When the applicable sentencing guideline range exceeds the full term of the sentence imposed by a foreign court, a transfer treaty prisoner's foreign sentence should be treated by the Parole Commission as analogous to a § 5G1.1(a) 'guideline sentence.'"). Consequently, the Parole Commission is in an analogous position to that of the district court relative to the convicted transferee, and the United States court of appeals for the circuit where the transferee is imprisoned at the time of the Parole Commission's determination has jurisdiction for an appeal therefrom. See 18 U.S.C. § 4106A(b)(2)(A); Trevino-Casares v. U.S. Parole Comm'n, 992 F.2d 1068, 1069, 1070 (10th Cir. 1993) (explaining that, because the Parole Commission translates the transferee's foreign

17

consistent with the Treaty in establishing procedure in the United States for administering foreign sentences. Section 3244 provides:

> When a treaty is in effect between the United States and a foreign country providing for the transfer of convicted offenders—
>
>> (1) the <u>country in which the offender was convicted shall have exclusive jurisdiction and competence</u> over proceedings seeking to challenge, modify, or set aside

sentence into an imprisonment release date and supervised release under § 4106A(b)(1)(A), "it is in procedure, substance, and effect tantamount to the imposition of a federal sentence," and thus, § 4106(b)(2)(A) "expressly makes the [Parole] Commission's determination directly appealable to the circuit level"); <u>see also</u> <u>Asare</u>, 2 F.3d at 542 (addressing this Treaty and the implementing statutes). "[T]he [Parole] Commission's order is not subject to collateral attack," <u>Bennett v. United States Parole Comm'n</u>, 83 F.3d 324, 328 (10th Cir. 1996), and "circuit courts of appeal have no original jurisdiction to consider habeas corpus petitions," <u>Trevino-Casares</u>, 992 F.2d at 1070. Although the Parole Commission transforms the foreign sentence into a federal sentence, its function is discrete: "[t]he [Parole] Commission is authorized to determine a release date and period of supervised release, not to sentence the transferred prisoner." <u>Navarrete v. United States Parole Comm'n</u>, 34 F.3d 316, 319 (5th Cir. 1994) (per curiam).

Separate from the Parole Commission's translation of a transferee's foreign sentence into a surrogate sentence that complies with United States penal law for service in this country is the BOP's implementation of that sentence of the convicted transferee with its determination of foreign and domestic good-time credits in accordance with 18 U.S.C. § 3624(a), (b). <u>See</u> 18 U.S.C. § 4105(c)(1); <u>Ajala v. United States Parole Comm'n</u>, 997 F.2d 651, 656 (9th Cir. 1993) ("[T]he calculation and award of foreign and domestic credits is not part of the [Parole] Commission's § 4106A determination, but is a matter for the Bureau of Prisons."); <u>see also</u> 18 U.S.C. § 4105(a) ("[A]n offender serving a sentence of imprisonment in a foreign country transferred to the custody of the Attorney General shall remain in the custody of the Attorney General under the same conditions and for the same period of time as an offender who had been committed to the custody of the Attorney General by a court of the United States for the period of time imposed by the sentencing court."). Pursuant to § 4105(c)(1), "the application of service credits is governed by 18 U.S.C. § 3624(a), which indicates, uncontroversially, that such credits are applied to the <u>sentence of confinement</u> the prisoner is serving." <u>Trevino-Casares</u>, 992 F.2d at 1072 (emphasis added). Dissatisfaction with the BOP's determination is addressed in federal district court by a habeas corpus petition. <u>See</u> <u>Asare</u>, 2 F.3d at 544. Thus, the distinct functions performed by the Parole Commission and the BOP "have separate procedural routes for judicial review." <u>Trevino-Casares</u>, 992 F.2d at 1069.

18

convictions or sentences handed down by a court of such country;

. . . .

(3) all proceedings instituted by or on behalf of an offender transferred to the United States pertaining to the <u>manner of execution in the United States</u> of the sentence imposed by a foreign court shall be brought in the <u>United States district court</u> for the district in which the offender is confined or in which supervision is exercised . . . .

18 U.S.C. § 3244(1), (3) (emphasis added). With respect to § 3244, jurisdiction in the Bahamian courts or federal district court turns on whether Bishop's habeas corpus proceeding is one "to challenge, modify, or set aside" his Bahamian sentence, § 3244(1), which plainly reserves jurisdiction in the sentencing court in the foreign country,[12] or pertains solely "to the manner of execution in the United States" of his

---

[12] The House Report explains the policy concerns behind limiting jurisdiction to challenge a foreign sentence to the sentencing country and specifically addresses habeas corpus relief:

> [Section 3244(1), formerly 28 U.S.C. § 2256,] provides that exclusive jurisdiction of any proceeding seeking to challenge, modify, or set aside convictions or sentences shall be in the country in which the offender was convicted and sentenced. Some question has been raised as to whether this is an improper limitation o[n] an individual's right, under the United States Constitution, to seek a writ of Habeas Corpus. This provision does not, in any way, suspend the writ of Habeas Corpus. It merely states that <u>certain types of challenges—to foreign convictions and sentences—may not be brought in American courts.</u>
> Witnesses before the Subcommittees of both the House and Senate Judiciary Committees were unanimous that such a provision is constitutionally valid. . . . [I]t is important to note that these provisions were considered essential in protecting the integrity of the judicial process of the respective countries and in securing approval for prisoner exchange treaties, in the past and presumably in the future. The Departments of Justice and State indicated that <u>neither the United States nor any other country which is currently a party or expected to become a party to a treaty for the execution of penal sentences would have acquiesced to a</u>

19

Bahamian sentence, § 3244(3), which places jurisdiction in the district court in the district where the convicted transferee is imprisoned or supervised.[13] Once a sentence has been imposed by a foreign sentencing court and translated by the Parole Commission into a sentence under our penal law, it is the BOP's determination of service credits that has been challenged in habeas corpus proceedings under "manner of execution."[14] See Kass v. Reno, 83 F.3d 1186, 1191 (10th Cir. 1996) ("Congress made it clear that despite the provision barring United States courts from reviewing the validity of a foreign conviction or sentence, 'a transferred offender may challenge in

---

provision which would permit the courts of the Receiving State to set aside or modify a sentence imposed by the courts of the Transferring State. Otherwise the fundamental sovereignty of a nation over crimes committed within its territorial boundaries would be impugned.

H.R. Rep. No. 95-720, at 41-42 (1977), reprinted in 1977 U.S.C.C.A.N. 3146, 3164-3165 (emphasis added); see 28 U.S.C. § 4100(c) ("An offender shall not be transferred to or from the United States if a proceeding by way of appeal or of collateral attack upon the conviction or sentence be pending.").

[13] See Boyden v. Bell, 631 F.2d 120, 121 n.1 (9th Cir. 1980) (acknowledging that 18 U.S.C. § 3244(3) "confers jurisdiction upon the district court of the district in which the transferring prisoner is confined to hear any challenges to the manner of execution of a sentence imposed by a foreign court").

[14] Since the administration of service credits, including calculation, awarding, and withholding, is done by the BOP under 18 U.S.C. § 3624, this process involves the execution rather than the imposition of sentence; thus, this function of the BOP is a matter for habeas corpus review in the district court. See Trevino-Casares, 992 F.2d at 1070; Boyden, 631 F.2d at 122-23 (challenging award of remission credits affecting parole); see also Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373 (1963) (holding that parole constitutes custody amenable to habeas corpus relief under 28 U.S.C. § 2241); United States v. Tubwell, 37 F.3d 175, 177 (5th Cir. 1994) (upholding denial of parole, the Fifth Circuit recognized that a habeas petition under 28 U.S.C. § 2241 "challeng[es] the manner in which [a] sentence is being executed rather than the validity of [the] conviction and sentence").

20

the [United States] . . . the manner of the execution of his confinement' and '[a]ny challenge in the courts of the [United States], <u>other than to the foreign conviction or sentence</u> is not precluded by [the implementing statutes], or any treaty.'" (quoting H.R. Rep. No. 95-720, at 43 (1977), <u>reprinted in</u> 1977 U.S.C.C.A.N. 3146, 3165) (alterations in original) (emphasis added)).  The district judge adopted the magistrate judge's conclusion that Bishop's habeas petition "involve[d] questions concerning both the nature of the sentence and the execution of the sentence."  R1-32-4.  Accordingly, the district judge determined that he properly had jurisdiction to consider Bishop's habeas petition pursuant to § 3244(3), and that is the argument of Bishop's counsel in this court.

We disagree.  Although the district judge purported to have adapted Bishop's Bahamian sentence, he actually <u>converted</u> it into a new sentence by impermissibly eliminating the additional five-year imprisonment term of Bishop's sentence for failure to pay the $80,000 fine imposed by the Bahamian court.  Because the United States had informed the Bahamian government that it would continue the original sentence, the district judge had no jurisdiction <u>to convert</u> or override Bishop's Bahamian sentence by fiat, when neither the Treaty nor the implementing statutes authorizes a district judge to convert a foreign-imposed sentence.  Furthermore, the district judge did not even have jurisdiction <u>to adapt</u> Bishop's Bahamian sentence because Congress has

21

charged the Parole Commission with the authority to translate a foreign sentence of a transferee into a sentence recognized under United States law. See 18 U.S.C. § 4106A; Asare, 2 F.3d at 542 (recognizing that the Treaty and statutory scheme do not authorize the Parole Commission to impose a new sentence but to translate the original, foreign sentence into one that can be administered under United States law).

As we have explained, the term of Bishop's sentence, as adapted by the Parole Commission to retain his Bahamian sentence, was consistent with and not "in violation of the Constitution or laws or treaties of the United States."[15] 28 U.S.C. § 2241(c)(3). The implementing statutes clarify "that while the laws of the receiving nation shall govern the manner in which the sentence is served, the laws of the sentencing nation shall continue to govern both the validity of the conviction and the term of the sentence." Tavarez, 668 F.2d at 808. Therefore, we reverse the district judge's grant of habeas relief to Bishop because the judge had no jurisdiction to entertain Bishop's habeas corpus petition challenging his sentence, much less to eliminate the supervised release established by the Parole Commission to retain the original Bahamian sentence. See Bennett v. United States Parole Comm'n, 83 F.3d 324, 328 (10th Cir. 1996).

### III. CONCLUSION

---

[15] To the extent that Bishop argues that this appeal and issues regarding his sentence are moot, our explanation of his original sentence, as appropriately adapted in compliance with the Treaty and implementing statues by the Parole Commission and not the district judge, nullifies this argument.

This appeal concerns whether a district court has subject matter jurisdiction to consider habeas corpus relief for a foreign-imposed sentence of a United States citizen who is to serve the remainder of his sentence in the United States pursuant to Treaty transfer. As analyzed, we conclude that the district judge did not have jurisdiction to grant Bishop collateral relief as to the five-year term of supervised release imposed by the Parole Commission for his failure to pay the fine imposed for his drug crime by the Bahamian court. Accordingly, the grant of habeas corpus relief to Bishop is REVERSED, and we REMAND with instructions that the district judge dismiss this case for lack of jurisdiction.